# APPENDIX A

Proposed Second Amended Complaint

Michael Garth Moore (023742)
4370 N. Via Entrada Hermosa
Tucson, Arizona 85718
Telephone: 888-318-0075
mike@mgmoorelaw.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Loren Sheldon,<br><br>        Plaintiff,<br><br>vs.<br><br>Special Agent Kenneth P. Fletcher, et al.,<br><br>        Defendants. | Case No.:  4:19-CV-00417-JAS<br><br><br>Jury Demand Endorsed Hereon<br><br><br>Hon. James A. Soto |

## SECOND AMENDED COMPLAINT

## I. INTRODUCTION, PARTIES & JURISDICTION

1.     At all times pertinent hereto Plaintiff Loren Sheldon was a resident of Cochise County, Arizona, where he operated a company named L Sheldon & Company, Inc.;

2.     At all times pertinent hereto, the named Defendants, except Contreras, were law enforcement officers employed by the agencies identified in the caption. All were working as part of a "Task Force" under the Border Alliance Group of law enforcement and drug interdiction agencies of the federal and local governments. Contreras was employed as a Cochise County Deputy Attorney;

3. These Defendants are sued in their individual capacities;

4. The actions of the Defendants, as set forth herein, were undertaken with the knowledge that they were acting in violation of Plaintiff's rights under the Constitution of the United States;

5. This action is brought under 42 U.S.C. §1983, to vindicate rights guaranteed Plaintiff under the Constitution;

6. Defendants Fletcher, Napolitano, Man, Aponte and Tomes are sued under 42 U.S.C. §1983, and, in the alternative, under the authority of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) to vindicate rights guaranteed Plaintiff under the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States;

7. This Court has jurisdiction of this case pursuant to the federal question statute, 28 U.S.C. §1331;

8. Venue is proper in this Court pursuant to 28 U.S.C. §1391;

## II.     FACTS

9. Plaintiff realleges Paragraphs 1 through 8 as if fully set forth herein;

### Background Facts

10. For twenty-three (23) years leading up to 2008, Plaintiff operated his business from the location 355 West Buffalo Lane, Whetstone, Arizona, and maintained a residence at 282 West Oak Street, Huachuca City, Arizona. He was a

respected member of the community, enjoying a reputation as a solid businessman and community leader;

11. Before November 2008, Defendant Fletcher was assigned to work in the Sierra Vista/Cochise County area, then the Phoenix office of the Department of Homeland Security [hereafter, "DHS"]; and, later, re-assigned to the Sierra Vista office of DHS. In those assignments, Fletcher learned of accusations made that Plaintiff was engaged in drug trafficking. Upon information and belief, Fletcher never secured any evidence of the reliability of any source;

12. After his return to the Sierra Vista office, Fletcher undertook to investigate Plaintiff and his business. All the accusations Fletcher had allegedly learned from his source or sources were documented and shared within the group of Defendants. This was also true of all future information, accusations and evidence secured by any one Defendant;

13. Before Fletcher was reassigned to Sierra Vista, Defendant Wilkins questioned a number of reputed drug traffickers, including V.S.. Wilkins recruited a source close to Plaintiff's business operation. That source, Wilkins knew, was of questionable reliability. The source informed Wilkins that Plaintiff was engaged in large scale drug trafficking, bringing large deliveries of marijuana over the U.S.-Mexican border, storing the drugs at his place of business, and then cooperating with other drug trafficking organizations ["DTO's"] to distribute the drugs across the country. As Fletcher had done, and continued to do, Wilkins shared the allegations

among the other Defendants. Though Wilkins knew his source or sources were unreliable;

14.     When Fletcher was reassigned to Sierra Vista and the Border Alliance Group, he and Wilkins began to work together in investigating Plaintiff. Upon information and belief, these two engaged the Defendants Man and Aponte in this investigation, under the umbrella of the Border Alliance Group. From that point until Plaintiff was arrested and indicted, all Defendants continued to share information and evidence, and all knew the sources were unreliable or failed to determine reliability;

15.     Fletcher and Wilkins could not have initiated, nor continued the investigation, in the absence of approval of Man and Aponte, both of whom were kept apprised of Fletcher's and Wilkins' actions as described herein, and approved those actions;

**November 25, 2008 seizure**

16.     On November 25, 2008, V.S. was detained on I-10 westbound, driving a dump truck owned by Plaintiff's company. The bed was loaded with numerous bales of marijuana, concealed under a load of dirt;

17.     Defendants' informant, Defendants alleged, had alerted them to the shipment, and Defendants had alerted law enforcement to be on the lookout, and detain the vehicle. Further, the informant claimed, it was alleged, that "drug activity" had been going on for months at a certain sand and gravel quarry, and that Plaintiff's company trucks were being used to move marijuana to Tucson. The informant also

claimed that Hispanic males were seen on the property carrying assault rifles. Defendants made no effort to corroborate this story of organized drug trafficking. Defendants knew the accusations, if there were such accusations from sources, were unbelievable, based, in part, on the results of ongoing surveillance of Plaintiff, his business and his home;

18.     Defendant Wilkins swore out a search warrant for search for the quarry, located at Plaintiff's business site, alleged to be the situs of the organized, ongoing drug trafficking He alleged the informant information, and that, based on his experience and knowledge, the location was being used for large scale transshipment of marijuana.  On November 25, 2008, a search was conducted. The search did not produce evidence that Plaintiff had engaged in drug use or trafficking. Wilkins and the other Defendants knew these accusations to be false, and failed to include in the application material exculpatory evidence;

19.     During the search, Plaintiff interacted with the agents and provided information to them. Agents came upon one "rolloff box" that had been modified by the welding of a steel plate that created a cavity under the plate. The rolloff was owned by Plaintiff.  Plaintiff informed the agents that he had previously noticed the modification, and had begun removing the plate by having the welds burned out along the sides, leaving the only connections at the corners. Plaintiff was intending to complete the removal when his business permitted. The agents seized the rolloff box, however, it was returned to Plaintiff.

20. Plaintiff was not charged with any crime at that time. V.S. was tried for the felony distribution charge, but acquitted;

**January 31, 2019 ~~2019~~ 2009 Seizure**

21. Between November 25, 2018 ~~2008~~ and January 30, 2019 ~~2009~~, Defendants continued to receive information from their informant;

22. On or before January 30, 2019 ~~2009~~, the agents were alerted by the informant ~~sources~~ that a Sheldon tractor-trailer loaded with a piece of heavy equipment, and transporting marijuana, would be travelling north from the yard the next day;

23. Wilkins notified Border Patrol checkpoints in the area to be on the lookout for such a vehicle;

24. On Saturday, January 31, 2019 ~~2009~~, a Sheldon employee, Clay Aitkens, left the Sheldon property driving a tractor-trailer rig owned personally by Plaintiff, carrying a grader purportedly owned by one J.S.Jr. for delivery to a location in Benson. Plaintiff had not ordered him to move the grader, but did it on the direction of J.S.Jr.;

25. When Aitken came to the Border Patrol checkpoint on Highway 90, the agents recognized the vehicle as the one identified by Defendant Wilkins, stopped it, and engaged in a consent search of the vehicle, and ~~later claimed to have~~ uncovered bundles of marijuana wrapped in cellophane in the cab of the tractor;

26. Aiken was arrested and the vehicles seized;

6

27.     On February 2, 2019 2009, Plaintiff, having been notified that Aitken had taken his tractor-trailer without permission, filed a stolen vehicle report with the Cochise County Sheriff;

28.     Aitken was charged with transporting marijuana, was tried, and acquitted. At all times, Aitken maintained that when he had left Plaintiff's yard there was no marijuana in the cab, and that he had witnessed the agents searching the cab but finding nothing;

29.     Approximately one (1) year after Aitken's acquittal, Fletcher made contact with him, and set up a meeting in which Fletcher and Napolitano were present. During that meeting, Fletcher told Aitken that he was "going to get Sheldon, take everything he has, his property, horses, vehicles and leave Sheldon broke, and put him in prison for the rest of his life." The two attempted to recruit Aitken to inform on Plaintiff, but Aitken refused;

30.     Plaintiff eventually recovered his tractor-trailer. He was not then charged with any crime;

**Events of 2012-2013**

31.     In 2009, Defendant Napolitano was assigned to work in the Border Alliance Group with the other Defendants. Napolitano learned of all the information previously obtained by Defendants, and from 2009 on, shared in all the information later obtained;

32.     Between 2009 and 2012, Defendants made contact with J.S.Jr. and his brother and recruited them as informants attempting to secure evidence of Plaintiff being a drug trafficker. The S. brothers ~~allegedly~~ provided information along the same lines as the other informant ~~sources~~, that Plaintiff was a drug trafficking "kingpin" responsible for vast amounts of illegal importation and distribution of marijuana. ~~However, Defendants' continued surveillance of Plaintiff, his business and his home belied the accusations. Defendants also knew that the brothers were unreliable informants given their history of criminal activity and drug trafficking;~~

33.     None of the information given by the S. brothers produced any tangible evidence of criminal activity on Plaintiff's part;

34.     In mid-2012, Defendants recruited another informant, this one being, upon information and belief, J.J.V., a long-time employee of Plaintiff's company. Defendants also recruited and sought information from another employee, D.J.;

35.     Over the next months, the informant ~~allegedly~~ told Defendants stories that tracked with those Defendants had heard, but embellished on those. For example, the informant told Defendants ~~alleged that an informant or informants reported~~ that Plaintiff was associated with his brother, who owned an aggregates company in Marysville, Michigan, and that there were large cash exchanges between them, leading Defendants to surmise that Plaintiff was laundering money for his extensive drug trafficking operations; and that Plaintiff had tens of thousands of dollars ~~in~~ cash in safes in his residence, even supplying the Defendants with alleged combinations to the

safes and credit card account information and PIN's . The informants, <u>Defendants alleged,</u> claimed over the months that Plaintiff was moving marijuana in coordination with the S. brothers, and detailed how he they claimed this was being accomplished – marijuana being moved to the Plaintiff's business, stored, packaged and distributed from that location.  The informants also claimed, <u>Defendants alleged,</u> that Plaintiff had stolen a trailer and a truck, and claimed Plaintiff had over 150 guns, included AK-47's;

36.    The informants also <u>allegedly</u> gave Defendants names and information regarding individuals he claimed were associated with Plaintiff in the drug trafficking;

37.    Despite this wealth of alleged facts, Defendants were unable to secure any credible evidence that Plaintiff was engaged in any criminal activity<u>, and the continuing surveillance did not reveal any criminal activity at Plaintiff's business or home</u>;

**February 19, 2014 Seizure**

38.    Before February 19, 2014, Defendants' informant, J.J.V., in cooperation with other actors, was engaged in drug trafficking, using Sheldon company vehicles as a front;

39.    Before that date, J.J.V or another informant told Fletcher of a shipment of bulk marijuana to be made using a Sheldon dump truck filled with manure to a location in Tucson;

40.    J.J.V informed Plaintiff that there would be need of a load of manure and backhoe work to be done at a location near where the company was doing sewer work;

41.     J.J.V made all the arrangements, and transported a load of manure to the location on Jennifer Lane and dumped it. He then informed Plaintiff that the owner was upset because the manure was supposed to go to a location in Tucson;

42.     Plaintiff made arrangements to meet J.J.V at the location with a backhoe to reload the manure into the dump truck;

43.     Unknown to Plaintiff, while the dump truck was sitting at the Jennifer Lane location, associates of J.J.V and the S. brothers ~~and/or other unknown persons~~, loaded bundles of marijuana into the bed. When Plaintiff arrived at the location, he used the backhoe to reload the manure, not knowing that the marijuana was in the bed;

44.     J.J.V told Plaintiff he could not drive the vehicle to Tucson, so Plaintiff assigned another employee, Rob Larson, to make the trip;

45.      Once the load was secured, J.J.V or another informant informed Fletcher and Wilkins of the specifics of the shipment, and Fletcher alerted Defendant Aponte, who in turn alerted Border Patrol checkpoints;

46.     At approximately 11:40 a.m., Fletcher was notified by Aponte that the vehicle was stopped for inspection at the checkpoint on Highway 83. By the time Fletcher got on the road, Larson had passed through the checkpoint and was on I-10 westbound. Fletcher had alerted Border Patrol to shadow the vehicle and unmarked cars followed it up I-10;

47.     Fletcher made contact with the vehicle in the afternoon in a South Tucson neighborhood, and saw Larson dump the load of manure, also seeing bundles of marijuana in the load;

48.     Larson was detained, a search warrant obtained, and the dump truck searched. A large amount of marijuana was discovered. Two Mexican nationals, Rene Fimbres-Molina, and Raul Eduardo Avendano-Cota, were arrested at the location with a large amount of cash;

49.     On February 24, 2014, Plaintiff was interviewed by Napolitano and Fletcher regarding the matter. He spoke freely with them without a lawyer present over a long period of time. The interview was recorded. Fletcher did the questioning. After Plaintiff explained his involvement, and the actions of J.J.V, Fletcher invited Plaintiff to "join Team America" because Plaintiff was the target of an investigation involving the S. brothers, and implied Plaintiff could escape the consequences of drug trafficking by giving up the S. brothers. He informed Plaintiff that he, Fletcher, had recordings of Plaintiff. He gave Plaintiff twenty-four (24) hours to come to "Team America" or, he claimed, he did not know what the prosecutors would do, because the investigation was closing in on Plaintiff;

50.     The next day, Plaintiff met again with the agents, informed the agents that he had spoken with a lawyer, and, as he had stated the day before, could not add anything to his statement of the 24th;

51.     Larson was released by law enforcement without charge. Fimbres-Molina and Avendano-Cota were charged, tried, and convicted of drug offenses. Plaintiff was not charged with any offense, nor was J.J.V. Defendants were unable in any interviews with any individuals to get information connecting Plaintiff was drug trafficking;

52.     Fletcher at some point asked Plaintiff to contact him if the S. brothers approached Plaintiff and proposed that he engage in drug trafficking. Plaintiff agreed to contact Fletcher;

**July, 2014**

53.     Following the seizure, Defendants put the Jennifer Lane location under surveillance; the observed activities between that address and 2314 Mustang Heights Road, Whetstone, Arizona;

54.     On July 11, 2014, agents witnessed what appeared to be individuals loading marijuana at a residence located at 2314 Mustang Heights Road, Whetstone, Arizona. Subsequently, a traffic stop was initiated, and law enforcement apprehended two individuals, H.M.S. and one G.C., and seized over one thousand pounds of marijuana in the vehicle;

55.     Following that, a raid was conducted on the residence, and two others arrested and a large amount of marijuana seized;

56.     Following that, additional individuals connected to the traffickers arrested were also seized. From those individuals, Defendant learned of numerous individuals involved in the bulk illegal importation and distribution of marijuana;

57.     The investigation and prosecution of those individuals, which included information from a confidential informant, did not come up with any evidence connecting Plaintiff with any criminal activities;

**Spring, 2015**

58.     Defendants continued to attempt to connect Plaintiff with drug trafficking;

59.     On June 23, 2015, Napolitano and Fletcher questioned H.M.S.. Although H.M.S. did not give any information connecting Plaintiff with drug trafficking, Defendants ~~falsely~~ associated him with the known traffickers;

60.     Defendants continued to interview individuals associated with H.M.S. and other known drug traffickers, but none would identify Plaintiff. As the year progressed, the law enforcement Defendants became more and more frustrated that they could not find any evidence that would convict ~~be sufficient to obtain an indictment of~~ Plaintiff ~~of~~ for drug trafficking;

61.     Around that time the S. brothers contacted Plaintiff regarding the delivery of hay. After Plaintiff ended the call, he called Fletcher to alert him to the approach, but Fletcher discouraged Plaintiff from reaching out to him;

**The arrest of Plaintiff**

62.     By August 2015, Fletcher, in consideration of giving the S. brothers a get-out-of-jail free card, recruited them to make contact with Plaintiff to induce him to engage in drug trafficking.  The law enforcement Defendants, unable to secure any

evidence through all the informants and interviews with known drug traffickers, decided to entrap Plaintiff into engaging in trafficking;

63. Over a period of weeks from August 25, 2015, through mid-September 2015, the S. brothers made a number of recorded phone calls to Plaintiff, and to J.J.V. There was one meeting on August 28, 2015 between Plaintiff, the S. brothers and J.J.V;

64. On September 24, 2015, Plaintiff delivered a dump truck to a location for the S. brothers to collect. Plaintiff understood that the S. brothers were digging a cattle tank in the Sonoita area, and they needed a dump truck and location to dump the fill dirt. He agreed to rent the dump truck for $4,500 per month, and identified a dug out area on his business property that needed fill dirt for them to dumpy the loads.

65. Upon delivery of the tractor to the location, Plaintiff was detained, and arrested by Defendants;

66. On that same day, Defendants Fletcher and Napolitano appeared before a Cochise County Superior Court Judge and filed a sworn application for a Search Warrant for Plaintiff's business and property. A true copy of the Application is appended hereto as **Appendix A**;

67. Although Defendants' lacked any evidence to support the following allegations, they made them as established fact in the first paragraph:

a.      In 2012, Defendants began investigating Plaintiff and that "SHELDON utilizes his company's tractor trailers from L. Sheldon & Co. Inc., to transport hundred pound quantities of marijuana from Sierra Vista....;"

b.      "Agents have identified SHELDON as a mid-level coordinator within the DTO [Drug Trafficking Organization]. This DTO is based in Mexico with mid and high level distributors operating in Sierra Vista, Huachuca City, and Tucson, Arizona as well as close ties to Michigan....;"

68.     The entirety of the second paragraph of the Application was false, in that Plaintiff never stored marijuana at his business or in a "trap" of a vehicle, nor did Defendants have any evidence that the invoicing that was done for deliveries was used to "evade any ties" with drug traffickers. It was also a fact that Defendants had no evidence that Plaintiff had been transporting marijuana, at any time, let alone for over ten (10) years;

69.     Paragraph 3 claimed the Defendants had obtained the information contained in the Application in July 2012, from a "reliable source." That was false;

70.     In Paragraph 6, Defendants identified the search conducted on Plaintiff's business in November 2008. They claimed that "underground conex boxes" had been discovered on the property; that was false. Plaintiff had previously partially buried two garbage truck containers for use as fallout shelters and also as a place for local gun club to hold training and live firings. Defendants knew this, but intentionally omitted the information from the Application, and substituted their "experience" that the

"conex boxes" were used to store marijuana. Further, Defendants swore that they had discovered a "large trash bend (sic) equipped with a false bottom." Defendants omitted the material information that the "false bottom" was of such a configuration that it could not have accommodated a single bulk package of marijuana, and had been rendered useless by being cut through, and that Plaintiff informed the agents of that at the time. Defendants omitted the salient fact that despite searching and seizing a load of personal property, including computers and other records, they had been unable to find any evidence of criminal activity;

71. Paragraphs 9 through 18 recounted claims of facts regarding the calls placed by the S. brothers to Plaintiff and J.J.V, and recordings of meetings held by the S. brothers with Plaintiff and J.J.V. Defendants peppered the Application with false claims, such as that Plaintiff and the informants would discuss the transportation and storage of "marijuana;"

72. Defendants swore that, in one of the recording conversations, Plaintiff informed the informants that as to the February 19, 2014 seizure, he had "fabricated a story [to the agents] which dissociated himself from the marijuana seizure…." This was entirely false;

73. In Paragraph 15, Defendants claimed that on September 19, 2015, when Plaintiff addressed renting his shop to the S. brothers, this was code for the illegal drug activity. This statement was false. Likewise, in Paragraph 17, when addressing the agreement drafted by Plaintiff for the services for a monthly fee of $4,500 [an entirely

reasonable fee for the services and rental], Defendants swore, without any evidence, that this was another instance of Plaintiff's clever disinformation campaign of "disconnecting" himself from the illegal activity. This was false. Defendants had no evidence that Plaintiff had created false rental receipts or invoices in the past;

74. Defendants concluded the Application with the claim that Plaintiff had agreed to accept $40,000.00 to deliver 1,000 pounds of marijuana at the direction of the S. brothers. They did not inform the Judge, however, that there was no 1,000 pounds of marijuana at Plaintiff's place of business, nor was any delivered to his place of business before September 24, 2015, and that when Plaintiff delivered the dump truck to the S. brothers, it was empty;

75. In the Application, Defendants deeply implicated J.J.V in the "conspiracy;"

76. The Judge signed the proffered Search Warrant 201500032, authorizing searches at both the business and residence;

77. On September 24 and 25, 2015, Border Alliance Group agents under the direction and control of the Defendants, searched both the business and home of Plaintiff. Although they seized personal property for a second time, including computers, hard drives, cell phones, and business records, they failed to locate any safes holding tens of thousands of dollars of cash, as their informants had claimed, no assault rifles, no 150 guns, no drugs of any kind. They failed to unearth any documents

connecting Plaintiff with any of the known drug traffickers, both convicted and otherwise. In short, Plaintiff's business and home were clean;

**The Indictments and prosecution**

78.     Before September 2015, Defendant Tomes was assigned to the Sierra Vista office and began working with Defendants;

79.     Before October 2015, Defendants attempted to secure an indictment of Plaintiff through grand juries convened by, first, the Office of the United States Attorney for Arizona; then, through the Office of the Arizona Attorney General. Both Offices declined to present evidence against Plaintiff;

80.     On information and belief, before September 2012, the law enforcement Defendants approached Roger H. Contreras, Deputy Cochise County Attorney. Contreras was given a history of the operations targeting Plaintiff. Contreras agreed to work with the Defendants to accomplish the arrest and prosecution of Plaintiff for drug trafficking. Defendants gave Contreras access to the files they had accumulated in their efforts to trap Plaintiff. Contreras read those files, learned of the ongoing surveillance and its failure to provide any evidence of the wild accusations that Plaintiff was a part of a nationwide drug trafficking cartel. Thereafter, Contreras advised the Defendants in their activities, including the drafting the search warrant application in 2015 and the plan to arrest Plaintiff after he delivered the dump truck to the Shell station. In so doing, Contreras was aware of the false allegations and material omissions in the application, but approved it. Contreras agreed to seek an indictment

of Plaintiff by convening a grand jury in that County. Subsequently, he was supplied by Defendants with more information and worked with them to prepare for the presentation of evidence;

81. Defendants prepared Napolitano to testify, and on October 1, 2015, she did testify before the Cochise County grand jury;

82. In that testimony, ~~as she had been prepared~~, Napolitano repeated the falsehoods and material omissions detailed above that were used to secure Search Warrant 201500032, and additional testimony, proffered as fact, which was not corroborated. Such evidence included, but is not limited to:

a. On and before November 28, 2008, over 2,000 pounds of marijuana were loaded onto a dump truck at Plaintiff's company;

b. That, in the search of the Plaintiff's business on November 28, 2008, several ledgers were found, and the appearance of illegal activity on the property;

c. That the dump truck which was seized on February 19, 2009, in Tucson, had been loaded with marijuana at the Plaintiff's business;

d. That the investigation had confirmed that in the 2008, 2009 and 2014 seizures, Plaintiff had "put the receipt in a third party's name [so he could] distance himself from the truck if it is seized by law enforcement" and that he had confessed to their informants that that was what he had done on the three dates;

e. That, in conversations with their informants, when Plaintiff used the term "dirt," he really meant marijuana;

f.     That after Plaintiff delivered a dump truck to a Shell gas station in Sonoita, it would be loaded with 1,000 of marijuana and returned to Plaintiff's business;

g.     That, Plaintiff assured the informants that the truck would be mechanically sound "so there would be no encounter with law enforcement back to Sheldon's shop….;"

83.    In light of the false evidence and material omissions by Napolitano, the grand jury issued an indictment of twenty (20) counts of drug trafficking against Plaintiff, including the 2008, 2009, 2014 seizures and the 2015 arrest, and also indicted J.J.V for crimes arising from the 2015 arrest. The charges were lumped together in Case. CR201500693;

84.    Plaintiff's counsel filed a Motion challenging the composition of the grand jury and questioning probable cause, and the trial Judge ordered that a new grand jury be convened;

85.    On January 22, 2016, Contreras convened the second grand jury, and Defendant Tomes, having been previously prepared by Defendants, testified;

86.    Tomes repeated the falsehoods and material omissions that were detailed above, and the grand jury issued a second indictment of the identical counts against Plaintiff and J.J.V;

87.     Over the period of the next two years, the State consecutively dismissed the charges against Plaintiff for the 2008 and 2009 seizures, then the 2015 arrest, and, finally, the 2014 seizure. The first dismissal occurred on August 25, 2017;

88.     On November 22, 2017, Plaintiff filed a Petition for Clearance of Record pursuant to A.R.S. §13-4051. On October 31, 2018, that Petition was granted. The Court stated that, in hindsight [the Court's hindsight] "there was no realistic probability that the State could ever prove the charges beyond a reasonable doubt….;"

89.     Although J.J.V's involvement in the actions that lead to the seizure in 2014, and was implicated by Defendants' informants as having participated extensively in the alleged 2015 conspiracy to traffic in drugs, he was never prosecuted for any offense;

### III.     FIRST CLAIM: MALICIOUS PROSECUTION

90.     Plaintiff realleges Paragraphs 1 through 89 as if fully set forth herein;

91.     Defendants prosecuted Plaintiff without probable cause, and with malice towards him;

92.     Defendants' actions, in seizing Plaintiff and his property, and in so prosecuting him, and in engaging in intimidating and oppressive surveillance of him and his business both before and during the prosecution, was intended to deprive Plaintiff of his right to liberty and to engage in his business and occupation under the First, Fourth and Fourteenth Amendments to the Constitution;

93.     Defendants succeeded in that goal in that, over the period of years the prosecution continued, Plaintiff's business was effectively destroyed;

94.     As a direct and proximate result, Plaintiff has suffered extreme emotional distress and other intangible losses, including, but not limited to the loss of his reputation and standing in the community; a permanent loss of income; has incurred costs and fees of his defense; and has suffered other damages not enumerated herein;

## IV.     SECOND CLAIM: JUDICIAL DECEPTION/FABRICATION OF EVIDENCE: FIFTH AND FOURTEENTH AMENDMENT

95.     Plaintiff realleges Paragraphs 1 through 94 as if fully set forth herein;

96.     Defendants' fabrication and material omissions of evidence, as set forth above, was done recklessly and/or intentionally;

97.     Plaintiff would not have been arrested, his business would not have been subject to search, and he would not have been prosecuted in the absence of the fabrications and material omissions of evidence;

98.     As a direct and proximate result, Plaintiff has suffered extreme emotional distress and other intangible losses, including, but not limited to the loss of his reputation and standing in the community; a permanent loss of income; has incurred costs and fees of his defense; and has suffered other damages not enumerated herein;

## V.     THIRD CLAIM: CONSPIRACY

99.     Plaintiff realleges Paragraphs 1 through 98 as if fully set forth herein;

100.    This Claim is brought pursuant to Section 1983;

101.    Defendants' course of conduct in 2015, as set forth herein, was as a result of an agreement among and between them to violate Plaintiff's constitutional protections against denial of due process and denial of liberty;

102.    ~~It was pursuant to that agreement that the Defendants fabricated allegations in the search warrant, left out material exculpatory evidence, authorized the arrest of Plaintiff, secured an indictment through false evidence and omission of material exculpatory facts, all of which led to the long prosecution, ultimately dismissed;~~

102 103.    As a direct and proximate result, Plaintiff has suffered extreme emotional distress and other intangible losses, including, but not limited to the loss of his reputation and standing in the community; a permanent loss of income; has incurred costs and fees of his defense; and has suffered other damages not enumerated herein;

WHEREFORE Plaintiff demands judgment, jointly and severally, against each Defendant, as follows:

1.    Under the First, Second and Third Claims, damages in the amount of five million, one hundred and fifty thousand dollars ($5,150,000.00);

2.    Under the First, Second and Third Claims, punitive damages in such amounts as the jury deems just;

3.    Interest, costs and an award of reasonable attorney fees pursuant to 42 U.S.C. §1988;

1    4.  Such other relief as the Court deems just.

          Respectfully submitted,

          /s/ Michael Garth Moore
          Michael Garth Moore (023742)
          9040 North Placita Verde
          Tucson, Arizona 85704
          Telephone: 888-318-0075

          Trial Counsel for Plaintiff

        Jury Demand Endorsed Hereon

## CERTIFICATE OF SERVICE

  I certify that a true and accurate copy of the foregoing was filed through the Court's electronic filing system on _____ 2020. Notice of this filing will be sent to all parties and counsel through the Court's filing system. Parties and counsel may access the filing through the Court's system.

          Respectfully submitted,
          /s/ Michael Garth Moore