Michael Garth Moore (023742)
6336 North Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
Email: mike@mgmoorelaw.com

*Trial Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Loren Sheldon,<br><br>Plaintiff,<br><br>vs.<br><br>Kenneth Fletcher, et al.,<br><br>Defendants. | Case No. Case 4:19-cv-00417-TUC-JCH<br><br>**MEMORANDUM OF PLAINTIFF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DOC. 242** |

**"I am going to get Sheldon, take everything he has, his property, horses, vehicles, and leave Sheldon broke, put him in prison for the rest of his life."**

**DHS/ICE Agent Kenneth Fletcher to Clay Aitken, April 30, 2014**

## I.   DEFENDANT HAS FAILED TO MEET ITS BURDEN ON THE MOTION, AND THE COURT SHOULD DENY IT

The United States has not only failed to properly support its Motion, it has done so in a manner that can only be described as disrespectful. Rule 56(c)(1)(A) requires that a movant must support its argument by "citing to particular materials in the

record….." The citations must be specific and to "particular parts" of the record materials. This District's Local Rule 56.1 augments that mandate.

Local Rule 56.1 requires a movant for summary judgment to file a separate statement of facts "setting forth each material fact on which the party relies in support of the motion. Further, the Rule mandates that "Each material fact in the separate statement must be set forth in a separately numbered paragraph and must refer to a specific admissible portion of the record where the fact finds support (for example, affidavit, deposition, discovery response, etc.)." Defendant has not even made a stab at meeting this fundamental requirement. It has provided *no Separate Statement of Facts*.

No doubt this Rule was issued for several reasons, but not the least of which is that by providing the non-movant with the opportunity to address each specific fact alleged, the Court's work is dramatically reduced – by eliminating the need to delve into the record when a movant's claimed fact is disputed. The United States' failure has denied Plaintiff the right and opportunity to target the claimed facts by going directly to the book-sized appendix to determine the validity of the fact alleged. And the failure has immeasurably increased this Court's work – requiring it to scour the record to determine what alleged fact is true.

Both Rule 56(e)(4) and Local Rule 56.1 empower this Court to deny a Motion which fails to meet the basic demand of a clear statement of the record. This case merits this course – the Court should deny the Motion and preclude Defendant from filing a second, properly supported one.

However, if this Court chooses to proceed to rule on the merits, *the only facts* this Court should and can consider are those identified in Plaintiff's properly formatted Controverting Statement of Facts.

## II.    STANDARD OF REVIEW

This Court of course reviews a grant of summary judgment in construing the evidence, and drawing all inferences from the evidence, in the light most favorable to the non-moving party. *Anderson v. Warner,* 451 F.3d 1063, 1067 (9th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Of great importance given the composition of the Motion, in reviewing the record as a whole, this Court must disregard all evidence favorable to the Defendant that a jury is not *required* to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 139, 151,120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (citing 9 A C. Wright & A. Miller, *Federal Practice and Procedure* § 2529 at 299 (2d ed. 1995) (emphasis added).

## III.    ARGUMENT OF LAW

**A.    A Material Dispute of Fact on the Question of the Lack of Probable Cause**

Defendant is correct that the grand jury indictment constitutes *prima facie* evidence that there was probable cause to bring the case against Mr. Sheldon. Defendant leaves out that "Among the ways that a plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct

undertaken in bad faith." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004).[1]

A plaintiff's testimony, standing alone, can be sufficient to defeat summary judgment on this issue. *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016) (a plaintiff's testimony may constitute independent evidence to prove defendants provided the grand jury with false evidence.). Here, Loren Sheldon's own testimony satisfies that burden, but we have much more evidence.

Further, there is a critical role for a fact-finder in determining whether or not probable cause existed:

> Whether a given set of facts constitutes probable cause is always a question of law to be determined by the court. The only function of the jury is to determine what the actual facts are if the facts are conflicting. *If from one set of facts the conclusion can be inferred that probable cause exists, and from another that it does not, it is for the jury to determine the true state of facts.*
>
> *Wolfinger v. Check*, 206 Ariz. 504, 509, ¶25, 80 P. 3d 783, 788 (Az. App. 2003) (emphasis in original); *see, Gonzales v. City of Phoenix*, 203 Ariz. 152, 155-56, ¶¶ 14-15, 52 P.3d 184, 187-88 (2002).

Initially, Defendant's claim, that Plaintiff's evidence necessary to overcome prosecutorial independence must meet the elements set out in *Deveraux v. Abbey,* 236 F.3d 1070, 1076 (9th Cir. 2001), is incorrect. The discussion of *Caldwell v. City & Cty.*

---

[1] The United States' citations to Arizona cases concluding that probable cause precluded a malicious prosecution claim [see, e.g., Motion, p. 12] are entirely inapplicable because there was no evidence in those cases that officers had fabricated evidence to induce the prosecutions.

*of San Francisco,* 889 F.3d 1105 (9th Cir. 2018), discussed *infra,* answers this argument, and there is more. In *Spencer v. Peters,* 857 F.3d 789, 799 (9th Cir. 2017), the Court explained that "those [the *Deveraux*] methods of proving deliberate fabrication are unnecessary in a case involving *direct* evidence of deliberate fabrication." (emphasis in original). The Court explained that a plaintiff's evidence that points to reckless or deliberate fabrication states a claim that survives summary judgment. As the Court wrote, "[N]o sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence." *Id.,* at 800, quoting, *Halsey v. Pfeiffer,* 750 F. 3d 273, 2929-93 (3rd Cir. 2014); *Costanich v. Dept. of Soc. And Health Svcs.,* 627 F.3d 1101 (9th Cir. 2010). Mr. Sheldon's evidence, detailed *infra,* establishes multiple instances of direct fabrication.

On September 25, 2015, Loren Sheldon, along with a worker Jesus "Fat Jack" Valenzuela, were arrested after they delivered a dump truck to a location outside Sonoita, Arizona. The arrests were the result of an investigation conducted by Kenneth Fletcher, DHS/ICE agent, and Jody Napolitano, DEA agent, which led to them creating an "Enforcement Operations Plan" under which agents and officers of multiple agencies participated. Plaintiff's Controverting Statement of Facts, Paragraph 15 [hereafter, "CSOF ¶__"]. The two agents identified themselves as the lead investigators. CSOF ¶¶15, 63.

Later that day, Contreras filed a "48-hour complaint" charging Mr. Sheldon with fifteen (15) felony counts. He did so solely on the basis of a Probable Cause Statement" submitted over the name of Napolitano. CSOF ¶¶64, 65, 76. The charges

were broken down as follows: four (4) each identical counts of drug trafficking and conspiracy arising out of seizures [alleged seizures] of marijuana in vehicles owned by Mr. Sheldon's company; one on November 28, 2008; one on January 15, 2009, and one on February 14, 2014. The last three (3) counts alleged conspiracy to transport drugs on September 24, 2015.

On October 1, 2015, Napolitano appeared before the Cochise County Grand Jury, and on the basis of her testimony, Mr. Sheldon was indicted on the fifteen (15) counts. CSOF ¶¶77, 82. That indictment was subsequently dismissed, and in January 2016, Contreras convened a second Grand Jury. This time, DEA agent Lori Tomes testified, and at her testimony, Mr. Sheldon was re-indicted on the same charges. CSOF  ¶¶83, 86.

The record evidence before this Court is that Loren Sheldon committed no crimes of any kind, but was a victim of a three-ring circus of vindictiveness and the ringmaster was Fletcher. A year and a half before the arrest, Fletcher made his intentions known when he interviewed Clay Aitken, who, five years before, in 2009, had been arrested driving a Sheldon Trucking Freightliner, indicted, tried but acquitted of drug trafficking. Fletcher told Aitken, "I am going to get Sheldon, take everything he has, his property, horses, vehicles, and leave Sheldon broke, put him in prison for the rest of his life." CSOF ¶51.

Fletcher had, for at least two (2) years before, already targeted Mr. Sheldon for prosecution.

Loren Sheldon is a seventy-eight (78) year old man who, beginning in 1985 ran businesses, including, among others, sand and gravel; excavation; buying, selling and renting trucks and construction equipment from his business property and home located in Huachuca City, Arizona.

**The failed 2012 investigation**

In July 2012, Fletcher and Napolitano opened their first investigation of Mr. Sheldon. The investigation was the product of interviewing a "Confidential Source," [a "CS"] who made wild accusations of Mr. Sheldon's alleged criminal activities, including that he laundered "large amounts of drug money" through a Michigan quarry business owned by Mr. Sheldon's ████. CSOF ¶¶1-4. The agents reported that the CS also connected Mr. Sheldon with the ████ -- ████████ and ██ ████████ -- and the ████████ Drug Trafficking Organization ["DTO"]. Id. While this unnamed CS was feeding Fletcher information, Fletcher had already recruited the ████████████, as a paid informant to get evidence against Mr. Sheldon. CSOF ¶¶ 9-10. The agents, through the spring, summer and fall of 2012, secured multiple reports on Mr. Sheldon and also conducted aerial surveillance of his property. CSOF ¶¶6-7.

The ██████ work as a paid informant was short-lived. On September 10, 2012, Fletcher "de-activated" him because, as Fletcher reported he was "unreliable and

uncontrollable." CSOF ¶11.[2] No record exists that the ▇▇▇ gave any intelligence to Fletcher. The investigation went nowhere, and Fletcher and Napolitano closed it on February 1, 2013.

Fletcher concedes that he had *no evidence to charge Mr. Sheldon* with any crime at the time he closed the investigation. CSOF ¶14. At that time, it must be remembered, the agents had the entire history of the seizure of Sheldon Company trucks in 2008 and 2009 and prosecutions that resulted therefrom.

This admission is critical because it means Fletcher knew then that there was no probable cause to charge Mr. Sheldon with any crimes related to the 2008 and 2009 seizures.

**The two earlier seizures**

On November 28, 2008, a dump truck driven by one Victor Siquerios was stopped in Tucson and bulk marijuana found in the bed. Siquerios, who bought and sold vehicles, had taken the truck from Mr. Sheldon's yard, as he told Mr. Sheldon, to show it to a prospective buyer. CSOF ¶¶ 116, 101.

On January 15, 2009, a Freightliner tractor pulling a lowboy with a road grader on it, was stopped at the Border Patrol Checkpoint. Clay Aitken was the driver. Aitken had agreed with the grader owner to transport it to a job site in Benson. Mr. Sheldon,

---

[2] The United States claims that the ▇▇▇ was not deactivated because of unreliability, Doc. 242, p. 4, ftnt 2, but the record refutes that claim.

who was out of town, was unaware of the move. The government claimed that three hundred pounds of marijuana was found inside the cab. Aitken was arrested, and after his release, told Mr. Sheldon that there was no marijuana in the cab and none had been taken out by agents as he was being held at the checkpoint. CSOF ¶¶102-105.

Cochise County Sheriff Detective Wilkins presented his case against Loren Sheldon for the 2008 and 2009 seizures, but the Cochise County prosecutor declined, because "there was not enough evidence to prosecute." CSOF ¶40.

Both Siquerios and Aitken were indicted and tried on drug trafficking charges. Both were acquitted. CSOF ¶38. No one else was charged.

**The 2014 seizure**

On February 19, 2014, a Sheldon company dump truck driven by ███████████ was followed by Fletcher and other agents from Cochise County to Tucson, where it was stopped and bundles of marijuana found in the bed. Larson was detained but never charged or prosecuted. Two Mexican nationals, Rene Fimbres-Molina and Raul Eduardo Avendaro-Cota, were arrested at the scene in Tucson and later prosecuted by Joshua Moser, Assistant Attorney General, and convicted. CSOF. ¶¶17-18; 41.

**Fletcher and Napolitano revive the association with the ████████ and the second failed investigation**

Even before the February 19th seizure, the agents had re-opened an investigation against Mr. Sheldon and also reportedly targeted the ████████. CSOF ¶¶15, 16. Following the February 19th seizure, the agents approached Joshua Moser, Assistant

9

Arizona Attorney General, to prosecute a case against Mr. Sheldon for the three seizures [2008, 2009 and 2014]. CSOF ¶25.

Meanwhile, on February 24, 2014, Mr. Sheldon sat down voluntarily with Fletcher and Napolitano, in which meeting Fletcher told Mr. Sheldon that he was a target of the investigation into drug trafficking along with the ███████. He invited Mr. Sheldon to flip on the ████████, but Mr. Sheldon denied any criminal activity and volunteered to ask people he knew what they knew about trafficking. CSOF ¶¶20-21. The next day, he met again with the two agents and informed them he had been unable to get any information. He agreed to call Fletcher if the brothers contacted him to do business. CSOF ¶¶22-23; 47.

Fletcher and Napolitano then began reporting to Moser about alleged cooperation they were getting from the ████████ – Fletcher writing that sixteen (16) days *before* the February 19th seizure the ████████ allegedly told him that they and Mr. Sheldon has just *completed* a move of bulk marijuana from a stash house in Sierra Vista to Mr. Sheldon's property. Fletcher was unable to explain why, with that knowledge, he did not move to seize the marijuana and make arrests. CSOF ¶27.[3]

---

[3] Interestingly, the United States quotes testimony by AAG Moser that he would not "give credence" to anything an informant said without taking that information to a judge to see if it suffices for issuance of a search warrant. Doc. 242, p. 5. Repeatedly in the years leading up to 2015, the agents had, so they claimed, numerous instances of informant information that would have sufficed to seek search and arrest warrants for Mr. Sheldon, but they did nothing.

The agents continued to send reports to Moser claiming that they had intelligence from additional [never named] CS's who were placing calls to the ▮▮▮▮▮ in the presence of agents, and that the ▮▮▮▮▮ were confirming that the "old man" was ready to move marijuana.[4] CSOF ¶¶28-29. They even claimed that the ▮▮▮▮▮ themselves placed "numerous" calls to Mr. Sheldon monitored by the agents. CSOF ¶33. On April 24th, Napolitano sent yet another report to Moser incorporating the allegations supposedly made by the CS in the 2012 investigation and claiming additional intelligence from other unnamed "sources of information." Napolitano claimed "multiple consensual conversations" with the ▮▮▮▮▮ and identified yet another unnamed CS2 who they claimed to have met in March 2014. CSOF ¶¶31-32.

In the April 24th report, the agents claimed that Mr. Sheldon had been involved with the ▮▮▮▮▮▮▮▮▮, in a shipment of over 1,000 pounds of marijuana that was seized in April 2011. The United States has produced not a single record of this alleged drug run, nor any seizure. CSOF ¶37.

The United States has likewise produced not a single audio or contemporaneous record of *any* of the claimed communications with the ▮▮▮▮▮ or any alleged CS or

---

[4] The United States claims that "Over time, at least six different people provided information to SA Fletcher regarding Sheldon…." Doc. 242, p. 4. To accept that claim, this Court must rely entirely upon the testimony of Fletcher, because the record is devoid of any contemporaneous recording or memorializing of alleged communications.

source of information, including no recordings of any alleged calls placed to the ███████ or to Mr. Sheldon by the ███████. CSOF ¶34.

Fletcher concedes that all of the information the agents had against Mr. Sheldon in 2014 investigation came from the several different sources of "the *same uncorroborated information*." CSOF ¶36 (emphasis added). Indeed, the absence of any contemporaneous record of these "sources" is not surprising because, as Fletcher conceded, he only documents communications which have investigative value. CSOF ¶35.

Mr. Sheldon, as this was going on, did receive a call in April 2014, from the ███████ in which they asked about buying hay from him, and, as he promised Fletcher, he placed a call to the agent and informed him of the contact. Fletcher, however, expressed no interest, and told Mr. Sheldon to go about doing business with them. This led Mr. Sheldon to believe that the government no longer had an interest in the ███████. But the ███████ did not follow up with the call and Mr. Sheldon went on with his life. CSOF ¶48.

Through the spring of 2014, the agents and Moser investigated Mr. Sheldon. The agents organized a surveillance operation of Mr. Sheldon's business. CSOF ¶30. Moser subpoenaed thousands of Mr. Sheldon's bank records which were analyzed by the government. CSOF ¶¶42, 53. The agents questioned Clay Aitken and another of Mr. Sheldon's workers, ███████████████. CSOF ¶¶49-51; 52. In July, the agents were involved in a major bust in Sierra Vista, with multiple arrests. CSOF ¶55. When the arrestees were questioned by Fletcher, they revealed intelligence about high level

operators of the ███████ DTO on both sides of the border – but had no information about Mr. Sheldon. CSOF ¶56.

By July, Fletcher was reporting to Moser that the ████████ were cooperating with the agents and "want to testify against SHELDON." CSOF ¶57. The agents continued to press Moser to meet with the ████████, but Moser never did. Fletcher reported to Napolitano that Moser is "*scared to use them for anything*." CSOF ¶¶58-59 (emphasis added). As with the earlier investigation, the United States has produced not one contemporaneous record, document or recording supporting the claim of the ████████ cooperation with Fletcher's investigation.

The entire investigation in 2014, like that in 2012, was a dry hole. On February 13, 2015, Moser issued a "Turndown Notice" to the government, declining to prosecute because of "the attenuated nature of some of the evidence and *the unreliability of the confidential informant.*" CSOF ¶60. Moser concluded this without knowing that Fletcher had concealed from him the history with ████████████ being both unreliable and uncontrollable. CSOF ¶45.

At this point, then at least one prosecutor had investigated the 2008, 2009 seizures, and Moser all three, and neither had concluded that there was probable cause to bring and indictment against Mr. Sheldon.

**August and September 2015, and the prosecution of Mr. Sheldon**

Sometime in August 2015, a year and a half after their last call, the ████████ reached out to Mr. Sheldon again. They told him that they wanted to rent a dump truck for an excavation job they were doing in Sonoita and also wanted to talk about buying

hay. The ▪ had a long history of doing business with Mr. Sheldon's companies, as they operated a construction company and ran livestock. Given this history and Fletcher's having given him a green light to do business with them, Mr. Sheldon agreed to talk. CSOF ¶110. In speaking with the ▉ over the next couple weeks, he learned that they needed a place to dump fill dirt, and during one meeting he showed them where they could dump at the old quarry site. CSOF ¶110. Providing a fill dirt dump location was another part of the normal business. As was his usual practice, Mr. Sheldon had a receipt written up confirming the rental terms for the truck, one month for $4,500.00. CSOF ¶110-111.

What Mr. Sheldon did not know was that, beginning on August 27, 2015, these proven unreliable individuals were signed up *again* by Fletcher as paid CI's. CSOF ¶61. On September 24, 2015, Mr. Sheldon and his worker Valenzuela, were arrested when they dropped the dump truck the ▉ had said they needed at the agreed location outside Sonoita. CSOF ¶62.

Napolitano wrote a Probable Cause Statement in which she claimed that Mr. Sheldon had agreed with the ▉ to transport 500 pounds of marijuana from Sonoita to his property for temporary storage, an amount later, on September 23rd, doubled to 1,000 pounds, for a cut of $40,000. CSOF ¶¶64, 65.

Immediately following the arrests, Napolitano and Fletcher swore out an application for a search warrant for Mr. Sheldon's home and business. CSOF ¶66. The first six (6) paragraphs recounted as fact the uncorroborated claims allegedly made

starting in July 2012 [CSOF ¶¶67, 70] and the bare facts of the 2008, 2009 and 2014 seizures. This "evidence" the agents gave to support the claim that

> Agents have identified Sheldon as a mid-level coordinator within the DTO. The DTO is based in Mexico with mid and high-level distributors operating in Sierra Vista, Huachuca City and Tucson, Arizona as well as close ties to Michigan.

CSOF ¶68.

The next ten paragraphs detailed meetings and calls recorded by the ███████ with Mr. Sheldon, with the prominent admission that during the key September 23, 2015 meeting between Mr. Sheldon and the ████████ when the deal to run and store drugs allegedly went down, "technical difficulties" resulted in the conversation not being picked up. CSOF ¶64. The judge issued the warrant on those claimed facts.

The searches authorized by the warrant were conducted over two (2) days. Despite informing the magistrate that they expected to find all the evidence and paraphernalia of a drug trafficking operation, the teams of officers turned up nothing incriminating. CSOF ¶¶73-74. Mr. Sheldon's phone was seized and analyzed. Nothing incriminating was found on it. CSOF ¶73, 75.

Cochise County prosecutor Roger Contreras filed a "48 hour complaint" identified *supra*, based entirely on the fabricated Probable Cause Statement, and then convened the Grand Jury of October 1, 2015 in which Napolitano repeated all the same historic allegations, never informing the jurors that the "proven reliable" sources, the "CS's" and sources of information were in fact uncorroborated and known to be uncontrollable and unreliable. She also repeated the same allegations regarding the ████████ attempt to entrap Mr. Sheldon. CSOF ¶¶77-79.

15

Lori Tomes' testimony, at the second Grand Jury in January 2015, repeated the same claims as were documented throughout the agents' reports, but added a stunning new "fact" that Mr. Sheldon had admitted to the ▮▮▮▮ during the September 23rd meeting [the one which had "technical difficulties"] that he had had "complete knowledge of everything that was going on" in the 2008, 2009 and 2014 drug movements. CSOF ¶84.

Both Napolitano and Tomes testified that Mr. Sheldon had fabricated hidden compartments in dump trucks to transport marijuana. CSOF ¶92.

**Fabrications and material omissions**

The fabrications in the application for the 2015 search warrant, the investigative reports and testimony secured by Contreras are, as is touched on, *supra,* many, the key ones being:

1. The agents presented wild accusations by unidentified "sources" as proven reliable when they knew this information was uncorroborated or proved false by the searches in 2008 and 2015. Case in point, Mr. Sheldon's alleged position with the ▮▮▮▮ DTO, his laundering drug money through ▮▮▮▮ company in Michigan, his stashes of cash and guns. CSOF ¶67 (Fletcher admitted there was no evidence for these accusations). Clearly, all the charges hinged on Mr. Sheldon being this "mid-level" operative in an international DTO.

2. The agents likewise concealed that their interrogations of *proven* ▮▮▮▮ DTO operators had failed to turn up any connection with Mr. Sheldon. They

16

did not reveal that the two operatives arrested in the 2014 seizure, Rene Fimbres-Molina and Raul Eduardo Avendaro-Cota, had not identified Mr. Sheldon as a drug operator.

3. The agents' claim that Mr. Sheldon had fitted his dump trucks with false bottoms to conceal drugs flatly contradicted by the failure to find any such vehicle. And, further, they omitted to report that all the property and equipment seized in the 2008 raid on his business, and the Freightliner, lowboy and grader seized in the January 2009 seizure, had been returned to Mr. Sheldon shortly thereafter – not forfeited to the government. CSOF ¶¶107-108.

4. Agents reported and testified that Mr. Sheldon's writing up of the $4,500 rental receipt was done to "distance himself" from the running of drugs – and to bolster that, the agents claimed he had done the same thing in the 2008, 2009 and 2014 incidents. Those were lies. CSOF ¶¶79-80. Fletcher in deposition admitted that the only "evidence" of this alleged practice came from his "uncorroborated source information" – none of who were identified as having provided intelligence that led to any of the seizures. CSOF ¶94.

5. Throughout the records, all the testimony, the agents presented the ▮▮▮▮ as reliable informants. Of course, they *had* to do that, because the ▮▮▮▮ alleged communications with Mr. Sheldon constituted the *only evidence* the agents had that established probable cause that Mr. Sheldon conspired in 2015 to run drugs. CSOF ¶95. But, of course, the agents knew all along that

the ██████ were *not reliable*. They concealed that key information from the prosecutors and the Grand Juries [CSOF ¶¶88-89], and even though Moser had been kept in the dark, he knew enough to be "scared to use them for anything."

6.  The concealment of this key information takes on a profound importance when the Court considers that the agents only "evidence" of Mr. Sheldon agreeing to run drugs was allegedly through the ██████ "decrypting" the "code" that they used with Mr. Sheldon. CSOF ¶87. Fletcher concedes that the *only* evidence the agents had that Mr. Sheldon agreed in the September 23, 2015 meeting to run and store drugs were Mr. Sheldon's words "interpreted" by the ██████ in debriefing – the Court will recall that this meet was not audio recorded because of "technical difficulties."

7.  Mr. Sheldon flatly denies that he engaged in drug trafficking with anyone, and never spoke about, or agreed to, run or store drugs with the ██████. He never told the ██████ or anyone he knew all about the earlier busts nor did he lie to the agents. CSOF ¶¶112-114.

Given the complete absence of any record of the debriefings allegedly conducted by the agents with the ██████ [or, for that matter, with *any* source], a fact-finder, to find plausible the evidence of this claimed "decryption," must rely entirely upon the credibility of Fletcher. A fact-finder may conclude, on all the evidence, that the agents' attributions of statements implicating Mr. Sheldon to these informants were fabricated by the agents or creatively contrived.

One final point about the relationship between Fletcher and these two informants. In January 2016, Fletcher secured payments of $6,000.00 and $4,000.00 to the ███████, respectively. According to Fletcher's report to superiors to justify the money, the payments *were not* made because of the ███████ work leading to the arrest and prosecution of Mr. Sheldon. He secured the approval to make the payments on the report to superiors that the ███████ were instrumental in the *February 19, 2014* seizure and convictions, the truck being driven by Rob Larson. CSOF ¶¶97-99. But Fletcher testified in deposition that the ███████ *had nothing to do with that seizure*. CSOF ¶100. Fletcher, then, lied to his superiors to get the ███████ paid. And shortly thereafter, both were "deactivated": because they were talking about their roles as informants "with outside parties." Exhibit 43, USAO 4101.

A fact-finder, on all the evidence, could reasonably infer that Fletcher recruited the ███████ to get Mr. Sheldon any way he could, including falsification of evidence, for which he rewarded the ███████ after Mr. Sheldon was indicted on the ███████ alleged evidence.

In sum, there is a wealth of evidence that controverts the existence of probable cause for the indictment and prosecution of Mr. Sheldon.

The United States concedes that malice, this key element, can be inferred from a lack of probable cause. *Cullison v. City of Peoria* 120 Ariz. 165, 584 P.2d 1156 (Ariz. App. 1978); *Bradshaw v. State Farm Mut. Auto. Ins. Co.,* 157 Ariz. 411, 418, 758 P.2d 1313 (1988) (malice does not require proof of intent to injure).  Here, as well, there is direct evidence of Fletcher's malice, hence, this element is satisfied.

**B.   The Facts Allow the Conclusion That the Agents' Fabrications and Omissions Were a Proximate Cause of the Prosecution**

The United States argues that the presumption of prosecutorial independence immunizes it against the Claim, because the agents' actions cannot be the proximate cause of the prosecution being commenced against Mr. Sheldon. But, as cited, *supra,* the presumption is rebutted by evidence that the prosecution was commenced because the agents who initiated it did so by means of fabricated evidence.

To begin, "[T]here is a clearly established constitutional due process right not to be subject to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Caldwell v. City & Cty. of San Francisco, supra, 889* F.3d at 1112. In *Caldwell,* the plaintiff produced evidence that the defendant officers deliberately fabricated evidence that was delivered to the prosecutors who initiated the charges and prosecuted the plaintiff. The prosecutor submitted a declaration in support of the defendants' motion that he only brought the criminal charges "after reviewing all the evidence available to him." *Id.,* 1109-1111.

On the strength of this declaration, the District Court granted summary judgment on the ground of prosecutorial independence. The Ninth Circuit reversed. The Court first cited the *Smiddy* decision, relied upon by the United States. *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981) ("Smiddy I"), overruled on other grounds by *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008).

Citing *Smiddy I*, the Court gave a few non-exclusive examples of how a plaintiff might overcome the presumption, including by showing that the officers

presented the district attorney with information known by them to be false, and that a plaintiff can also rebut the presumption by presenting evidence that the officers knowingly withheld relevant information from the prosecutor. *Id.,* at 1116 (citation omitted). The Court concluded, then, that "we hold that Giannini's [the prosecutor's] consideration of potentially fabricated evidence rebuts any presumption of independent judgment and creates a factual issue for the jury. *Id.,* at 1117-18; *See, Blankenhorn v. City of Orange,* 485 F.3d 463, 483 (9th Cir. 2007) (plaintiff rebutted presumption of prosecutorial independence where, at the time of charging, the prosecutor only considered police reports and not contradictory evidence that showed the reports might contain fabricated evidence).

Once the presumption is rebutted, then, the analysis reverts back to a normal causation question. *Id.,* at 1117. That analysis is satisfied by evidence that the agents "set[…] in motion a series of acts by others which the agent knows or reasonably should know would cause others to inflict the constitutional injury." *Crowe v. City of West Sacramento*, 608 F.3d 496, 430 (9th Cir. 2010). Here, the agents' stated intent was to have Mr. Sheldon indicted and prosecuted.

The undisputed evidence is that the only evidence the prosecutor had when the decision to indict Mr. Sheldon was made were the agent's statements and reports and the Probable Cause Statement – all of which have been shown to be riddled with fabrications and omissions of key evidence. Hence, the question reverts to the normal causation analysis, which, at this point, requires the fact-finder to decide which evidence to believe.

The single Arizona decision relied upon by the United States is not applicable. In *Walsh v. Eberlein,* 560 P. 2d 1249 (Ariz. Ct. App. 1976), the court held that there *was* probable cause to charge the plaintiff, and that the defendant officer's actions were not the cause of the continuation of the prosecution because nothing was withheld by the officer. The court stated that the evidence had been known to the prosecutor at the time of the charging: "In short, Letnes had virtually the same information as Officer Walsh, and, after his own investigation of the Rososchi file directed the prosecution of Eberlein until July 25, 1973." *Id.,* at 345. Contreras' own evidence in this case is that he conducted no independent investigation and never knew the fabrications or key fact that the alleged reliable sources, upon whose alleged evidence the entire prosecution was premised, were proven to be unreliable and unbelievable. Indeed, "That an action is instituted is, of course, fundamental to [the tort of malicious prosecution], and that the accuser was *instrumental in its institution or continuation* is necessary." *McClinton v. Rice*, 76 Ariz. 358, 367, 265 P.2d 425 (1953) (emphasis added). This test is framed in the disjunctive. And the injury accrues when the victim is indicted, and the prosecution commences. At this stage of the proceedings, the evidence more than meets the test for malicious prosecution.

**C. There is a question of material fact whether the criminal case terminated in favor of Mr. Sheldon**

In Arizona, there is no per se rule that a voluntary dismissal of the underlying case is *not* a favorable termination for purposes of a malicious prosecution claim. *Frey*

*v. Stoneman*, 150 Ariz. 106, 110-11, 722 P.2d 274, 278-79 (1986). Rather, a court must evaluate the particular circumstances and merits of the case to determine whether termination was actually favorable. Id. at 111, 722 P.2d at 279. Evidence that the state withdrew the charges because of an understanding that they lacked merit is sufficient to satisfy this burden. *Id.* ("If the action was dismissed because of voluntary withdrawal or abandonment by the plaintiff, *the finder of fact may well determine that this was, in effect, a confession that the case was without merit*." (emphasis added)). Thus, although determining favorable termination is generally an issue for the court, a jury question arises if there are disputed facts about the reasons for the termination. *Id.* There is such evidence on this record.

Mr. Sheldon's prosecution was carried forward for two (2) years, but when the case was set for trial, the case came apart. As the Declaration of Joseph DiRoberto **[cite]** reveals, only days before the trial was set, the prosecutor moved, *seriatim,* for dismissal of all charges. The Court granted dismissal of all the charges stemming from the 2008, 2009 and 2014 events with prejudice, leaving only the 2015 charges without prejudice.

Of course, the 2015 charges were never refiled, and the Court, in response to Mr. Sheldon's Petition for clearance of his record, granted that Petition. [cite]. The statute of limitations, even if the State could have refiled, ran years ago. Hence, the policy basis underlying the favorable termination element is absent. *City of Phoenix v. Ronan* 2014 Ariz. App. LEXIS 361 *28-29 (D. Ariz. March 25, 2014) (potential for

inconsistent judgments if state refiles dismissed criminal charges ground for holding plaintiff failed to satisfy favorable termination element).

Under the reasoning of *Frey,* there is sufficient evidence before this Court to require the fact-finder to decide if the actions of the prosecution constituted a confession that the charges were without merit. Attention should be paid to the reasoning of the Supreme Court of the United States, in holding that a malicious prosecution plaintiff need only produce evidence that the prosecution concluded without a finding of guilt, whether by dismissal or trial, in order to maintain such a claim:

> The question of whether a criminal defendant was wrongly charged does not logically depend on whether the prosecutor or court explained why the prosecution was dismissed. And the individual's ability to seek redress for a wrongful prosecution cannot reasonably turn on the fortuity of whether the prosecutor or court happened to explain why the charges were dismissed.

*Thompson v. Clark,* 596 U.S. 36, 43-46 (2022).

Defendant quotes from the Superior Court language in its ruling clearing Mr. Sheldon's name in which the Court stated that "The *grand jury testimony* and the testimony at the hearing on the petition clearly establish probable cause." Motion, p. 13 (emphasis added). Defendant put in the record none of the testimony presented at the hearing. The only relevance of this statement by the Superior Court could be to the affirmative defenses of claim and/or issue preclusion. The Defendant invites this Court to grant summary judgment because another court previously, allegedly, ruled on the same claim in this case. Defendant fails to make that defense.

Neither of these defenses is available to the United States.

24

Issue preclusion binds a party to an adverse decision on an issue in a previous lawsuit if:

> (1) the issue was actually litigated in the previous proceeding, (2) the parties had a full and fair opportunity and motive to litigate the issue, (3) a valid and final decision on the merits was entered, (4) resolution of the issue was essential to the decision, and (5) there is common identity of the parties.

*Campbell v. SCZ Props., Ltd.*, 204 Ariz. 221, 223, ¶ 8-9 (App. 2003).

In the context of fabrication of evidence leading to prosecution, the defense is not met in the absence of positive proof that the previous court considered each of the fabrications and material omissions alleged in the instant case and affirmatively ruled on the truth of each representation and the immateriality of each omission. *Dunkle v. Dale,* 668 Fed. Appx., 254, 255 (9th Cir. 2016). The Court applied the rule later more fully explained in *Janjua v. Neufeld,* 933 F.3d 1061, 1064 (9th Cir. 2019) that "issue preclusion does not apply to those issues that could have been raised but were not…."

Where the previous decision does not explicitly address, and resolve, each particular alleged fabrication, the defense fails., *Costanich v. Dep't of Social and Health Services,* 627 F.3d 1101, 117, n. 10 (9th Cir. 2010); *See*, *Sardarbekians v. Cnty. Of Los Angeles*, 2023 U.S. Dist. LEXIS 150217 *77 (C.D. Cal. July 28, 2023) (federal courts "do not consider, for example, [when deciding issue preclusion arguments] whether the veracity of the witnesses was at issue, *but whether the core alleged misrepresentations were actually litigated*.") (emphasis added).

Here, the United States' evidence fails as to the first, second and fifth elements. First, the Defendant has failed to produce evidence that the Superior Court was

25

presented with, and addressed, the specific fabrications in this record. Second, Mr. Sheldon did not have a full and fair opportunity to litigate the fabrications. As Mr. DiRoberto testifies, he was unable to secure the files on the ▮▮▮▮▮ which revealed their utter lack of credibility and he could not examine agent Fletcher, and examination which would have revealed the evidence in this record. The Superior Court specifically relied upon the truthfulness of the agents' testimonies in the two grand jury proceedings – testimonies shown herein to be false in material respects.

Nor is there a "common identity" of the parties. The United States was no party to the criminal case.

For claim preclusion to be found, the two actions must share "(1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties." *Clem v. Pinal Cty.*, 251 Ariz. , 354 ₱8,  491 P.3d 1156, 1160 (Ariz. App. 2021).

Further, a party asserting claim preclusion must meet the "same evidence test." *Phoenix Newspapers v. Dep't. of Corr.*, 188 Ariz. 237, 241, 934 P. 2d 801, 805 (Ariz. App. 1997) (Under the "same evidence" test, "Only slight variations of the facts to support different theories of the same incident can result in a court finding different causes of action, thus thwarting the purposes of res judicata.").

In *Clem*, the Court held that government agents sued in their individual capacities were not in privity with the government agency so as to bar a subsequent suit in which the officer was not named in his individual capacity. *Clem, supra,* 251 Ariz. 353, 354 ₱₱912, 491 P.2d at 1160-1161 ("a government employee named solely in an individual capacity is not in privity with the government."). Here, of course,

26

neither the federal agents nor the United States were in privity with the Cochise County Attorney. Perhaps more on point, the evidence Mr. Sheldon must proffer to make out the malicious prosecution claim is significantly greater than defending the drug trafficking charges. Hence, the defense cannot meet the "same evidence" requirement.

Finally, the decision did not constitute a final order because Mr. Sheldon *won* the petition. He thus had no recourse to the Court of Appeals to correct any lower court's errors.

The evidence of the Superior Court's statements fails to establish the defense.

## IV.    CONCLUSION

For the reasons set forth above, Mr. Sheldon's claim may not be decided without a full and fair trial in which the Court will hear, read and assess all the evidence. The Motion should be denied.

Respectfully submitted,

/s/ Michael Garth Moore
Michael Garth Moore (023742)
6336 North Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
Email: mike@mgmoorelaw.com

*Trial Counsel for Plaintiff*

27

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing was filed through the Court's electronic filing system on June 4, 2025. Notice of this filing will be sent to all parties and counsel through the Court's filing system. Parties and counsel may access the filing through the Court's system.

Respectfully submitted,

*/s/ Michael Garth Moore*
Michael Garth Moore (023742)
6336 North Oracle Road, Suite 326, No. 119
Tucson, Arizona 85704
Telephone: 520-437-9440
Email: mike@mgmoorelaw.com


*Trial Counsel for Plaintiff*

28